Thank you, Your Honor. May it please the court, for the record, I'm William Herd, and I represent Brandon Raub, former Marine, veteran of Iraq, who was seized and locked up in a mental hospital without probable cause. We have all read in newspapers of those stories where there has been a failure in the mental health system, resulting in someone who should be in the hospital not being so confined. And those results are tragic. This is from the other side of that same coin of incompetence. Here we have someone who was not mentally ill, there was no probable cause to believe that he was mentally ill, and the record shows that, with the report of Dr. Martin, there was a lack of any evidence of mental illness. And yet he was seized from his home and later confined to a hospital for a period of time. Now, the central evidence in this case is the report of Dr. Martin. We're here on summary judgment, and her evidence is the evidence on which this case must be decided. And what she said was that there was a lack of evidence of mental illness, and it was a violation of professional standards and grossly negligent for Campbell to file his petition for involuntary treatment against Rob, and also a violation of professional standards and grossly negligent for him to order direct to decide that Rob be seized at his home. But let me ask you this. It seems to me that you're arguing that there's a different standard by which to determine probable cause to take a person into custody for psychological examination. Well, if the person is a mental health expert versus a police officer, there's a different standard to evaluate probable cause that depends on the education, perhaps, of the individual who's made the decision. Am I right that you think there's a different standard? I think that's right. I think you have to exercise reasonable professional judgment, and that is what the district court actually said. The amount of evidence that would be necessary for a police officer to make that decision might not be sufficient for a person with mental health training, mental illness training. Exactly, and Mr. Campbell is supposed to be a trained mental health professional. I've never seen that, though. If that was true, it would seem to me that we would have different scales for law enforcement officers depending on whether or not they were a rookie or a 40-year veteran, whether or not they've been to classes dealing with this. And I've never seen in the law enforcement context a different standard depending on how much education you have or your experience. Your Honor, let me address it in terms of what I believe the baseline principle is, and it was articulated again by the Supreme Court in the Heine case only last month. It said the Fourth Circuit, excuse me, the Fourth Amendment, the Fourth Amendment tolerates only reasonable mistakes. I hope the Fourth Circuit would tolerate only reasonable mistakes as well. The Fourth Amendment tolerates only reasonable mistakes, and those mistakes, whether a fact or a flaw, must be objectively reasonable. Now, what is reasonable for a person who has mental health training and what is reasonable for a policeman on the beat? All very different things. Any case you've got from anywhere in the country that makes that distinction? Yes, sir. We cite in our brief a case out of the out of the Tenth Circuit. Excuse me, actually Second Circuit, on page 45 of our brief. Though committing physicians are not expected to be omniscient, the statute implicitly requires that their judgment affecting whether an individual is to be summarily deprived of her liberty be exercised on the basis of substantive and procedural criteria that are not substantially below the standards generally accepted in the medical community. That doesn't seem to be a probable cause determination.  But not as the probable cause, which, as the chief suggests, should not be a sliding scale depending on the experience or expertise of the particular individual involved. Either you have probable cause or you don't. Let me address that question in two ways. Number one, if a police officer happens to know something about the situation, and that would tend to exonerate the person against whom he is seeking a warrant, and does not convey that, well, that certainly is a problem for the police officer in a case like this. And we have that here. We have that here in terms of the interview by Campbell of Robert's mother, who said she saw no changes in his behavior. A very critical fact, as Dr. Martin discusses, and yet withheld by Campbell from the magistrate. We also have this fact. If a jury based... Now you're talking about the determination of the magistrate. The question is whether or not the initial seizure was appropriate. Well, the information that Rob and the police officers have at the time that supported that determination, that's what we need. Well, of course, we're not we are not... We have really two different deprivations here. The deprivation at Rob's home, we believe, was instigated by Campbell. He's the one who made the decision, and he made the decision without even interviewing Rob. That right there is a problem. Even if you get past that, when he's in Campbell's custody and is being interviewed by Campbell, he's supposed to conduct a reasonable interview. He's checked off the box delusional, paranoid. Why did he check off paranoid? Well, the diagnostic standards manual gives five reasons why a person might be psychotic and otherwise specified, which he checked off. Hallucinations, Campbell said he didn't find any. Disorganized speech, Campbell said he didn't find any. Grossly disorganized, Campbell said I didn't apply. It's all in his deposition. Caliphonic behavior, Campbell said that didn't apply. The fifth one is delusions. That's what he said applied. What delusions are you talking about? Well, the delusions were that Mr. Rob believes, as to a lot of other conspiracy theorists, Mr. Rob believes the United States was involved in 9-11. He believes the United States is involved in dropping thorium from airplanes. I don't think that. I don't think this court thinks that, but a lot of Americans do think that, and it's all over the Internet. Those are not delusions in the clinical sense. What about the fact that Mr. Rob believed that a revolution was coming, and he was the intended leader of that revolution? That seems a little bit delusional to me. Well, of course, as we point out, there was an animoticon wink following that, but no. That's not enough to say that you are psychologically delusional. It may be, maybe not as a, you know, as a conclusive matter, but the question is whether or not there was enough probable cause. A very flexible standard, not intended to be an overwhelming standard, but whether or not there was enough to require further. Yes, Your Honor, and that is a question to be decided on the evidence when the finder of fact hears expert testimony from both sides. Well, if, but, wait, wait, hold on, hold on, excuse me, but if the facts are, in fact, not in dispute, and the question as to reasonable objectiveness is a, isn't that a question of a matter of law for the judge to sort out? Your Honor, not when it comes to what conclusions you can draw in terms of mental health. Your Honor, I said a moment ago that you thought that Mr. Ra was believing a revolution is coming might be psychologically delusional. That is for a psychologist to say, Your Honor, and the only psychologist in this case has said no, that is not evidence of delusion. She looked at the whole, she looked at everything that Mr. Campbell looked at, and she said that there is a lack of evidence of mental illness. This case ought to be remanded, that us put on that evidence, that Mr. Campbell put on whatever evidence he has to support his conclusion that there was mental illness, and let the finder of fact decide if there was, in fact, probable cause to reach that result. Let's see my- Let's suppose that the decision had been made by a police officer. Would your, would Dr. Martin's testimony then be relevant as to what she is a psychiatrist or psychologist, I forgot what she was, what her view was as to whether or not probable cause, I mean, as to whether or not psychological illness existed? I think it'd be relevant, but I think that in that case that a layman's view of it would be certainly relevant as well. In this case, where you've got a supposedly professional mental health expert making the determination, I think you've got, in the cases we cite, my brief says this, you've got to have mental health testimony, mental health expertise testimony, in order to draw any conclusions as to whether a particular fact suggests mental illness or not. All right, so your, your position really is dependent on whether or not there's a different standard about which to evaluate probable cause, depending on whether or not it's a police officer, somebody with some mental health training. Your Honor, we do believe there's a different standard, but we also believe this, that even if you were to apply the police officer standard to this case, that a police officer has no right to misrepresent, and we believe the evidence in this case would allow a jury to conclude that Mr. Langley, or recklessly, misrepresented to the magistrate the condition of Brandon Robb. He withheld critical information that the person closest Mr. Robb saw no change at all in his behavior. That is abysmal. Secondly, he told the magistrate that Mr. Robb was paranoid and knew better. He is a trained mental health professional. A trained mental health professional would know better than to make those comments. So in your view, the police officers should have not called a mental health professional at all, but the stand, the reasonable, reasonableness, the standard is lower for them, and they certainly had sufficient indication of threats to himself and others to reasonably seize him. Well, of course, we contend they didn't see or the seizure that, that, that, that Campbell did. We just, we just, we, Dr. Campbell, they'd have been better off. No, we, that, we didn't, we're not suing them. I know. Well, our concern only is with, with Mr. Campbell, who knew better. Now, he may not have known better at the time that Robb was seized at his home, but he certainly knew better at the time he told the magistrate that Mr. Robb was delusional and paranoid. Of course, Mr. Robb refused to talk to Dr. Campbell and talked for over an hour to Dr. Martin. Well, it's, it's, he's not a doctor. He's, he's, Campbell's not a doctor. Well, those are all facts that can come out before a jury, but Dr. Martin says this was a terrible interview. He was, he was tied with his hands behind his back, half naked and barefoot, sitting five hours on a wooden bench. That's not how you treat a mental health patient. Maybe how you treat a prisoner of war or an enemy combatant, but it's not how you treat a mental health patient. No wonder he wouldn't talk. That is abysmal. This evidence would allow a jury to conclude that we, at least with respect to the petition for involuntary commission, that, that Mr. Campbell knowingly misrepresented Mr. Robb's mental state. He knowingly did that because he is a mental health professional and the evidence is a mental health professional would not have reached those conclusions based on what he saw. And since he told the magistrate that Mr. Robb was delusional and paranoid when he'd do better, if you apply the police officer standard, he is still liable in this case. So this needs to go back. He needs to go back to the jury that the competing versions of the facts be presented and the verdict rendered. He asks that you overturn the decision below. Mr. Hurd, let's hear the argument on behalf of Mr. Campbell. Good morning. May it please the court, my name is Stelp Arthemus. I'm the deputy county attorney for Chesterfield County. With me here today are Jeff Minks, the county attorney, and Julie Seyfarth, assistant county attorney. Let me begin, your honor, by saying that this case is before the court on qualified immunity. The issue before the court is whether Campbell could reasonably have known or believed that the action that he took on August 16, 2012 violated Robb's either First or Fourth Amendment rights to be free from unreasonable search and seizure. Now, if the standard is, as Mr. Hurd suggests, if there is a different standard for mental health workers than there is for police, it has not been determined what it is. If that is the case, then certainly Mr. Campbell is entitled to qualified immunity because there is no standard. If it is the same standard that applied to police, that's the standard. Your position would be the law's not only not clearly established, it's not established at all. It's not established at all, your honor. Yes, sir, and I don't believe the Second Circuit case that Mr. Hurd cited is at all relevant. As Judge Diaz suggested, it's under a completely different regulatory process. What happens in the in the state where the Second Circuit was was talking about is you have an actual psychiatrist who has treated an individual who is not in custody and has made a much more detailed determination about commitment and has actually gone through the commitment process without any judicial oversight at all, at least at the point that that is being reviewed here, and it's more along the context of a malpractice situation. So sure, in that kind of situation that the Second Circuit was facing, it makes some sense that you would have those kinds of medical standards, but what we have here, of course, is is a mental health prescreener certified as such who is operating in the exact same kind of situation that the police are operating in. Once Mr. Rob is detained by the police, there are a grand total of four hours available before he has to be released unless a further detention order, a temporary detention order, is entered. During that four hours, the first thing that has to happen is that the subject has to be brought to wherever it is that he's going to be evaluated. In this case, the record will show that it took about half an hour for that to happen. So the first half hour was gone before there was even any contact between Mr. Campbell and Mr. Rob. Then you had an interview. Yes, it happened at the jail. Yes, Mr. Rob did not have a shirt on. The record also reflects that Mr. Rob resisted being detained, had to be forced into the police cruiser to be taken to the evaluated, had to be handcuffed, and actually that the police wanted to charge him with assault and battery of a police officer. So yeah, he was taken to the jail for safety concerns, and he was interviewed there. That was the best that could be done under the circumstances. And as Judge Thacker indicated, he refused to be interviewed after about 12 or 13 minutes. Mr. Rob disputes some of those facts, and if we're dealing with a qualified immunity defense, we have to accept the facts and the light most favorable to the petitioner in this case, to Mr. Rob. So what do you make of the fact that there is a dispute, and the fact remains that he was interviewed in this very less than pristine circumstances? Well, I don't think there's a factual dispute between what happened, right? Mr. Rob did not submit an affidavit. He does not dispute any of the events that happened on August the 16th, 2012. He disputes through his expert, who I will get to in a minute, what the significance of those events might be. But he does not dispute that it took half an hour. He does not dispute that he was interviewed. He does not dispute that he later refused to continue speaking. He doesn't dispute any of that. But why isn't the significance of what occurred a question for a fact-finder, given the competing views of a psychologist in this case, to suggest that there was no, that Mr. Rob was not suffering from any mental illness at the time of the seizure? Well, first of all, to go back to what I said a minute ago, there is no standard established for a psychiatrist or a psychologist, or a mental health worker, because Mr. Campbell is not a psychologist or a psychiatrist. He's a certified prescreener. There's no standard established for him to know where the line is. That's the first thing. So they needed to get a certified prescreener, a prescreener to apply as to the standard? Well, I don't think that would have helped, Your Honor. I think there's other things going on here, and there is a case that I want to bring to the court's attention that I apologize is not in our brief that we found afterward, but I think it really bears on the situation that we have in front of us. Let me begin by making this point, which is that we have other mental health experts in this case. They didn't testify, but the record establishes that ultimately, after Mr. Robb was detained and taken to John Randolph Hospital, he was treated and evaluated for an additional two or three days, and the mental health officials at John Randolph agreed with Campbell and further petitioned for Mr. Robb to be detained for up to an additional 30 days. And there was a full evidentiary hearing held in front of a special justice of the General District Court of the City of Hopewell, and as a result of that hearing, it was also determined to lengthen the period of detention for up to an additional 30 days. Now, I think the significance of that is underlined by this case, Your Honor. It's the case of Doe v. Whelan, W-H-E-L-A-N. It's a Second Circuit case reported at 732 Fed 3rd 151. The context of that case was a slightly different. It was a social services case in which three children were removed from a home by social workers on an emergency removal. No judicial involvement in the first instance. Social workers removed the children on the belief that the children were in an unsafe environment. There was an ex parte hearing before the court three days later at which the court entered an order confirming the the removal of the children. And then there was about six weeks later a full evidentiary hearing before yet another state court judge in Connecticut at which after the full evidentiary hearing the court, a second different judge, expanded the removal even further. Children were removed from the home until September, a couple of months later, when another hearing was held in front of the first judge and he allowed the children to return to the home under some conditions. The mother and the children then filed a lawsuit under 1983 claiming that the children were seized improperly. They bring an expert in, expert social worker, to say there was no reason to believe that these children were in an unsafe condition. The Second Circuit said that the trial judge was was correct and not considering that the opinion of the plaintiff's expert to be important because you had you had three people on one side, and you had one person. It doesn't matter how many on either side. The point is that in you when you get in situations like this, these emergency type situations in particular, but in any situation requiring professional judgment, you're just going to have a situation sometimes in which different people come to different conclusions. And there isn't necessarily a right or wrong answer. You're dealing with in gray areas. And as long as you've got a situation like that, the mere fact that there happens to be one person out there who takes a contrary position doesn't change the fact that in a qualified immunity context, you have a public official who's in a situation where he reasonably believes what he's doing is constitutional. So what is what is the standard then to review this official's actions? You seem to be suggesting that any decision that they make is immune from judicial review. Well, no, I think that certainly certain well qualified immunity itself I think establishes what the standard is in the broadest sense. Yeah, but you're defining that in the context of professional judgment and suggesting that no matter how many experts may be on the other side of this issue that opine render an opinion contrary to the official who made the decision at the time that we're not in a position to evaluate that. Is that what you mean to say? No, I think if you have true bad faith true bad faith action on the part of a of a defendant and sure you would you would not have that kind of situation, but we don't have that here and there isn't any other. Well, Mr. Rob says you do because Mr. Campbell is alleged to have omitted as he puts it certain critical facts that might have led to a different result. Well, first of all, you're right. That's just that that I know he says that but it's it's not true. He says that that Mr. Campbell withheld from the magistrate the fact of his interview with the mother and that's that is that's just not true. If you go to the appendix to page 696 in the appendix in his pre-screening report, Mr. Campbell was given to the magistrate. This is was given to the magistrate. This is part of his of his narrative. This counselor contacted client's mother. She shares the same beliefs and supports her son's behaviors. That's what he told the magistrate. Now, what what's going on here, Your Honor, is is and this this is apparent from the from from Mr. Campbell's deposition testimony. Mr. Mr. Rob wants to take that information and say that it's an indicator that that that Mr. Rob was not mentally ill because here's somebody who agrees with him. That's not the way Mr. Campbell looked at it, but Mr. Campbell said was okay, I've got a situation here where I've got a guy who believes some things that are kind of out there. But as as Your Honor said earlier, he also believes some things that are beyond that. He believes that he's being chosen to be the leader of a revolution. Now, I've got his mother. She may not think he's been chosen to be the leader of the revolution, but she also believe these other believes these other delusional things and that's just buttressing his his feelings and aggravating him and stirring him up and creating more of a of an environment in which he's the leader of a revolution and he's going to go out and shoot the town up and be the start of you dying and all the things that are contained in his in his email that you know that had all of all the threats in it. So the the the difference here isn't so much that he didn't tell the the magistrate, it's that he interpreted the facts that were in front of him in a way that Mr. Rob just wants to disagree with. But the facts are still the facts. Mr. Heard began his opening argument referencing the fact that Mr. Rob was a former Marine, although at once a Marine, always a Marine, but the fact that he does have military service and apparently has some expertise in demolitions and otherwise, how does that how do those facts apply in this context? Well, I think that they apply in this context because they make the they make the the threat that I am going to shoot the town up. This is the start of the dying and that kind of thing. They make those those threats more credible, more believable. It again, it doesn't necessarily obviously have to come from the Marines. It can come from any place, but somebody who has experience in demolition is capable obviously of committing a lot of damage. And, you know, the fact here is and it's it's it's easy to forget in this climate, but it's it bears remembering that this all took place just a few weeks after the Colorado movie theater shootings and people were on the alert in that context about just this type of behavior and what might happen. Well, but the fact that something like tragic like that had happened recently doesn't to my mind suggest that we need to dilute the Fourth Amendment and its protections simply to accommodate that concern. No, of course not. Okay, so how does that how is that at all relevant in this context? Well, an individual who is saying he's going to shoot the town up who is actually just a 15 year old living at home with no access to weapons, no training and how to use them or anything like that, I think is less of a threat than an individual who has a great deal of experience using firearms and a great deal of experience having been trained in the use of explosives. So again, it's it's the means that are available to him. You know a threat such as the one that that that Mr. Rob made. I was talking more specifically about the Aurora, Colorado shooting that you referenced that that happened at about the same time and my point was that despite that tragedy I don't think you meant to suggest that the Fourth Amendment is thereby diluted and officers get the benefit of the doubt and are able to reduce the protections that we're all entitled to under that. No, no, sir, of course not but but I think that under qualified immunity I don't know, maybe this is a semantics thing, but under qualified immunity, I think they always get the benefit of the doubt. If you have a situation in which they are they are acting in good faith, which is what I think you have here. When you have a situation in which I mean if they had gone to Mr. Rob's house in in response as they did to all of this information and had found him you know bedridden in a wheelchair and unable to leave his home then they would not have had a situation where they would have seen somebody who had the means to actually carry out what it was that he was talking about. They might have handled it differently, but the point is because of his training because of the of what he knew what was available to him and whatnot he was in a situation where he was certainly capable of carrying through on the threats and that was one of the points that was you know raised and addressed in the pre-sentence or the pre-screening report that that Mr. Campbell prepared and gave to the judge, gave to the magistrate. The standard that I believe has been set for these mental health detentions in the police cases was set forth has been discussed really in four different cases that have been before the court in the past. You've had you have the Gooden case which was the en banc case out of Howard County, Maryland. You have the SK versus the city of Tacoma Park, Maryland case. You've got the Cloninger case which actually set a probable cause standard and you have the Bailey case. In which there was no evidence to support the detention. Let me ask you to address an issue. Yes, sir. I think it's agreed that the law of the state does not give Mr. Campbell the authority to order the detention of a person for psychological examination. Yes, sir. But the position Rob is that he regardless that he did tell him he did make the decision and they would not have taken him into custody without his decision. So what is your response to that position? Well, I don't think that the I don't think that the that the facts support it and I don't think the legal it's clearly Let's assume the facts support it just for the sake of argument. Then what what is your response? What's the legal response? Well, the legal response first of all would be that that it was the correct decision. There certainly was enough evidence Presented at the scene to support question is can there be liability on someone who does not have the legal authority to make decision? But who nevertheless factually is a factual matter did make this as I understand the law your honor I don't believe there is unless he's conspiring with some with someone else and in this case He couldn't have been conspiring with anybody. We know that because because mr Rob has acknowledged in his brief that the police officers at the scene acted appropriately I don't know how the police officers could have acted appropriately in deciding to to Detain, mr. Rob yet the mental health worker who agreed with them could have acted inappropriately It's it seems to me to be a non sequitur In any case the the I think the thread that runs through the mental health cases is that when you have when you have a report of Matters that would be appropriate for a detention if you go and you investigate and you Corroborate that those threats are do in fact exist. It's what is which was done in this case Because mr. Rob was given every opportunity to say I wasn't serious about the things that I said and when you have some evidence of Of a mental health problem, then it's appropriate to go ahead and and do the detention Which is what happened here and that being the case? I believe the trial court was correct and granted summary judgment And do you do you agree with your colleague that the standard for determining probable cause to take a person into custody for? psychological examination Is different depending on whether the person making the decision is a police officer or a trained person trained in? Detecting mental illness I do not agree with him your honor I believe that they should be the same and what is that standard that standard is what was set forth in cloning er Which is if if a reasonable hand through the man standing? Yes, sir Thank you. Thank you Mr. Heard good luck Thank you on a briefly first with respect to the interview with the mother What was critical about the interview with the mother was that she told Campbell that she had seen no change in his behavior That is the critical fact that bears upon his psychological condition that Campbell did not report to the magistrate number two Underlying the county's argument is a view that these really were threats and In the legal sense that were posted on the internet If these were truly threats Posted on the internet, then there was a remedy under federal and state criminal law specifically under federal law 18 USC 875 C Makes it illegal Communicate threats To harm the person of another When those threats are made in interstate commerce, and it's well settled that posting threats on the internet Means you're posting threats in interstate commerce Now the problem with that is that the federal prosecutor disagreed with the analysis That now the county is trying to persuade the court to accept that these were actual threats If they were actual threats, they had a way to handle it. But if they're not actual threats We don't believe they were You can't say. Oh, well, he looks kind of dangerous to me. Let's have him committed No, you don't commit a sane man because you think he's dangerous That's not the way our Constitution works He hasn't committed a crime Prosecutors said he didn't he hasn't committed a crime It's not enough to say that the prosecutors say he didn't they didn't say that day. It was Yes, ma'am. They did the record shows and Judge Hudson agnostic That before the officers went to Rob's home they spoke both with state prosecutors and with federal prosecutors who Said we don't see a crime here If there was a crime if they made a mistake, they should have arrested him There was no crime and You can't go to a man who is sane and say well You look kind of dangerous to me and therefore we're going to treat you as if you are mentally insane Your views are politically revolutionary. You want to lead a revolution? You think that the United States government's not acting properly? you don't disrupt you distrust our government and Then oh that makes you dangerous and we're going to lock you up. That sounds a whole lot like the Soviet Union Yeah, if the officers had never consulted mr. Campbell but had taken him into taking your client into custody based on what they say they knew Would there have been a Fourth Amendment? violation by the officer a closer case your honor a much closer case But obviously this is not that case. This is a case where We've got a mental health evaluator Supposedly someone trained in mental illness making the decision actually making making both Do you disagree with the cloning your standard that your opposing counsel suggested was the appropriate standard a reasonable prudent man? Irrespective of background and professional credentials, I Do I do disagree with that? And of course even even if that were the standard it's sort of the police officer standard that they argue in their brief The evidence again as I said during my opening remarks would allow a jury to believe that Campbell acted deceitfully or recklessly And it's well settled that a police officer cannot obtain a warrant by withholding material information Or by making statements that are materially untrue that he knows or should know or untrue so you think a police officer when applying for a warrant has an obligation to advise the magistrate of all the evidence indicating the innocence of the Evidence that's the law you know and I believe that's well established in the Fourth Circuit that that that is the law the the The Miller case Miller versus Prince George actually talks. It has two different standards in there one standard is is Officer must act reasonably and getting a warrant and that if the officer Acts unreasonably and nevertheless gets the warrant then he is liable There's no probable cause There's also in Miller a tougher standard. I don't know why you can read the case both ways or why it's been that way but under the the tougher standard if he deliberately or recklessly Conveys false information or withholds material information from the magistrate he is he is liable Here the facts would allow a jury to conclude that Campbell did both of those things And this is not a case where it's simply a difference of opinion. It's got to be within the bounds of professional judgment and yes, that those bounds may be a little bit bigger because of the Limited time frame a little bit bigger because he's or not a full-fledged psychologist, but they don't disappear completely So this case go back under one of two ways Send it back under the police standard and let us show that Campbell lied or acted With reckless disregard for the truth or acted unreasonably all without Miller standards read But if we don't have a separate stand for mental health professionals Then please in addition to sending the case back use this case as an occasion to give us one On the saucier that approach is not any longer required But but give us what a standard should be when a mental health professional goes awry So that they know so we all know how to hold them accountable Thank you. Thank you honor. We'll come down to great counsel and then take a break about five or ten minutes
judges: William B. Traxler Jr., Albert Diaz, Stephanie D. Thacker